**O'LEARY et al. v. LIGGETT DRUG CO.**
**Civil Action No. 47.**

District Court, S. D. Ohio, W. D.

Nov. 30, 1943.

Marston Allen and Theodore Greve, of Allen & Allen, both of Cincinnati, Ohio, for plaintiffs.

Ralph Munden and Charles L. Byron, of Wilkinson, Huxley, Byron & Knight, both of Chicago, Ill., and I. G. Bieser, of Landis, Ferguson, Bieser & Greer, of Dayton, Ohio, for defendants.

NEVIN, District Judge.

This is a suit for patent infringement. The patent in suit is No. 1,971,793, issued August 28, 1934, to William J. O'Leary (now deceased), assignor to Walker & Dybvig, a partnership, on application filed November 11, 1927. It is for an "Electrical Apparatus" and relates to synchronous motors.

The patent contains fifteen claims. Of these, only claims 3, 6 and 7 are in issue.

It is stipulated (Exhibits 1, H, and Rec. pp. 89–92) that defendant, The Liggett Drug Company, sells an electric clock manufactured by the E. Ingraham Company, of Bristol, Connecticut, and it is charged that the motor in this Ingraham clock, model MK 210 (Ex. 10), constitutes an infringement of the three claims just referred to.

It is further stipulated that defendant, The Liggett Drug Company, sells what is known as the "Westclox" electric clock, (Ex. 8), which is manufactured by the General Time Instruments Corporation, Westclox Division. It is alleged that the motor in this clock also infringes claims 3, 6 and 7 of the patent in suit.

The bill of complaint was filed on October 12, 1939. Plaintiffs are Lucy B. O'Leary, assignee, and the Rotor Clock Company— an Ohio corporation—an exclusive licensee, both residing in the Southern District of Ohio. Defendant, The Liggett Drug Company, is a corporation of the State of Delaware, having a place of business in Dayton, Ohio. The title to the patent and rights thereunder in the plaintiffs and the jurisdiction of the court are admitted.

It is agreed, however, that the manufacturers hereinabove referred to are defending this action and are to be bound by the results. As to this, the record (p. 10) shows as follows: "Mr. Byron: (of counsel for defendant) Our position is just this, your Honor. The manufacturers are here defending the defendants. We do so openly and avowedly and now to the knowledge of the plaintiffs. So that a decision for or against the defendants in cases 47 and 49 will inure to the benefit or be against the manufacturers, so that there will be estoppel so far as the questions of infringement and validity are concerned. It will work both ways."

There are several defenses set up in the answer, including invalidity, non-infringement and laches.

In his patent, the patentee states, inter alia: "This invention relates to devices which are adapted to operate at a synchronous speed, and more particularly to a synchronous device of this character having an unwound armature rotatably mounted in an electromagnetic field. Another object of the invention is the provision of a synchronous device of this character which is simple in construction and which is adapted to operate smoothly at a speed which is constant and dependent only on the frequency of the alternating current supplied to the device."

Paintiffs assert that: "O'Leary made a great and meritorious inventive step forward in the synchronous motor art, when he took the utterly simple motor of two poles and one core of the prior art and divided up the poles into a number of salients, so that on opposite sides of his armature, he had a series of projections all of the same polarity and obtained a small, compact and efficient little motor having only one coil which was as operative as the complicated and expensive alternating current prior art synchronous motors, where they had successive field poles with each pole having a different polarity."

On the other hand, defendant contends that: "The prior art is replete with examples of motors operating upon precisely the same principle and having structures the same in all patentable particulars as O'Leary's motor. The O'Leary claims in suit are invalid thereover."

It was not until after a prolonged prosecution in the Patent Office that a decision was rendered by the Board of Appeals in favor of patentability. The Board stated: "While the structure and principle of operation of applicant's machine after being disclosed appears obviously quite simple, it is our opinion that the extreme simplicity indicates invention over the relatively complex structures disclosed by the references. We believe invention is involved in this radical simplification of the device in view of the differences in structure involved in accomplishing it. Neither the structure nor the exact principle of operation of applicant's device is anticipated by any of the citations and it is our opinion that invention is involved therein."

Upon a full consideration of all the evidence, including the documents and other exhibits, as well as the oral testimony, and certain demonstrations made in court at the trial, as shown by the record, the

court is unable to agree with the conclusion of the Board of Appeals.

■ In this connection, however, it should be stated that two of the prior art patents here in evidence, to-wit, Holtz Patent No. 1,892,553, and Rowe Patent, 1,919,395, were not cited by the Patent Office. The applications · for these two patents were filed, respectively, approximately four and five and one-half years before O'Leary filed his application. Although they did not go to patent until after O'Leary filed, they are, nevertheless references against O'Leary. Alexander Milburn Company v. Davis-Bournonville Company, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

As to Holtz Patent 1,892,553, plaintiffs submit that it is for "a motor of a very different type from those which we have been discussing;" that the Holtz motor "is a mixture of an induction and the reaction type of motor" and that "the O'Leary motor operates on a different principle from the Holtz motor, and the fact that Holtz went to the lengths that he did, and built the complicated arrangement that he shows, indicates that he did not grasp the possibilities of the extremely simple structure that O'Leary taught."

Plaintiffs further submit that "the defendants say that Holtz teaches that if the squirrel-cage winding were removed, the motor would operate after a fashion. This is correct enough, but when Holtz stated this, he did not indicate that the shading rings should be removed from the stator poles."

As to Rowe Patent No. 1,919,395, plaintiffs state (Br.P.41) it "is another example of what Holtz shows."

It is the view of the court, however, that Holtz Patent No. 1,892,553 discloses every detail defined in the claims in suit. In addition it discloses a self-starting feature embodying a shading or starting coil on one salient of each field pole, as well as a squirrel-cage winding upon the rotor. The difference in structure recited in the claims in suit with respect to the disclosure of this Holtz Patent amounts merely to the omission by O'Leary of the self-starting feature, together with its function—an omission which any mechanic skilled in the electrical art must have fully understood before O'Leary entered the field.

At the trial a motor was demonstrated which was precisely like the disclosure of Holtz Patent No. 1,892,553, and a modified motor was demonstrated which was precisely like the disclosure of the Holtz Patent, except that the shading coils were omitted from the field poles and the squirrel-cage winding was omitted from the rotor. It was demonstrated (Rec.P. 542) that the rotor of this modified motor had no residual magnetism.

The Holtz motor first mentioned operated perfectly as a self-starting synchronous motor. The modified motor operated perfectly as a synchronous motor after it had been started in operation manually. Its operation was the same as the O'Leary motor, which also must be started manually.

As substantially agreed between the parties, Rowe Patent No. 1,919,395 is similar in construction and in mode of operation to Holtz Patent No. 1,892,553.

■ The court is of opinion that what is claimed in the claims here in issue was well known and fully disclosed in the prior art, before O'Leary's application, and that the patent in suit, and particularly claims 3, 6 and 7 thereof, are invalid, as being anticipated by the prior art and for lack of invention over the prior art.

As stated by the Supreme Court in Cuno Corp. v. Automatic Devices Corp., 314 U. S. 84, at page 91, 62 S.Ct. 37, at page 41, 86 L.Ed. 58: "we can not conclude that his (O'Leary's) skill in making this contribution reached the level of inventive genius, which the Constitution, Art. I, § 8, authorizes Congress to reward." See, also, United States Gypsum Co. v. Consolidated Expanded Metal Companies, 6 Cir., 130 F.2d 888, 892, and American Rolling Mills v. Finke Engineering Co. et al., D.C., 45 F.Supp. 442, and cases there cited.

Referring specifically to Claim 6 in suit, defendant (Br. Pp. 8, 9) says: "To add to the mystery, plaintiffs have chosen Claim 6 as illustrative of the claims in suit. This claim recites elements which cannot be found either in the O'Leary disclosure or in any of the devices charged to infringe. This Claim 6, quoted on page 4 of plaintiff's brief, recites ' * * * a field structure * * * having at least two series of poles with similar pole salients thereon * * *'. Referring to O'Leary, there is only one series of poles, to-wit— the series comprising the pole indicated by the numeral 21 and the pole indicated by the numeral 22 in Figure 1 of O'Leary.

How plaintiffs can construe this indefinite Claim 6 to read on the O'Leary disclosure or on the accused devices is certainly not clear."

In their reply brief (pages 13, 14), plaintiffs state "the defendants attack Claim 6 on the ground that its language is confusing. It would seem that there is indeed a confusing situation in this claim. * * * The language poorly expresses the true concept, but as a whole the claim read with the specification defines the O'Leary motor in spite of this circumlocution in language. The word 'series' is misplaced."

■ The court concludes, also, that Claim 6 here in issue is further invalid because it is ambiguous, too indefinite and has no support in the disclosure of the patent.

In the briefs of counsel and the record, reference is made to so-called "commercial success"—or, as defendant claims, the lack of it.

Plaintiffs assert that "the Rotor Corporation plant was not large enough for 'real quantity production' and they had no sales force whatever (Rec. 191) so they attempted to interest others in manufacturing and selling on a royalty basis" and they set forth (Br. Pp. 17, et seq.) what they claim is "the commercial history" of the O'Leary motor in these regards.

Defendant submits that: "This indirect reference to commercial success is quite without force. Of course, commercial success even if present cannot both raise a doubt and then resolve the doubt in favor of patentability. Republic Rubber Co. v. G. & J. Tire Co., 7 Cir., 212 F. 170, 172; United States Sanitary Specialties Corp. v. West Disinfecting Co., 7 Cir., 3 F.2d 997. Commercial success, of course, has no bearing if patentable invention is plainly lacking. Carroll-Thomson Co. v. Central Brass & Fixture Co., 6 Cir., 22 F.2d 253, 254."

■ As stated by the Court of Appeals of this Circuit, in United States Gypsum Company v. Consolidated Expanded Metal Companies, supra, 130 F.2d pages 893, 894: "It has, however, become axiomatic that commercial success will tip the scales in favor of validity only when otherwise there is doubt as to the patentability of asserted claims."

In the instant case, the court entertains no doubt as to the invalidity of the patent.

In view of its conclusion, it is unnecessary for the court to, and it does not, discuss or decide the issues raised in the pleadings with respect to the other defenses.

· The facts are sufficiently set forth by the court in its findings. As stated by Judge Woolsey in Penmac Corp. v. Esterbrook Steel Pen Mfg. Co., D.C., 27 F. Supp. 86, 87: "It is now a work of supererogation to write a considered and detailed opinion on the facts in what used to be an equity cause and is now called a non-jury cause, for the place of the opinion must now be taken by formal findings of fact and conclusions of law, separately stated and numbered. Title 28, United States Code, Section 723, 28 U.S. C.A. § 723."

Upon a consideration of the whole of the record, the briefs and arguments of counsel and the applicable law, the court has arrived at the following:

### Findings of Fact.

1. This is a civil action based upon an allegation of infringement of United States Letters Patent No. 1,971,793 for an "Electrical Apparatus", issued August 28, 1934 to William J. O'Leary (now deceased), of Montreal, Quebec, Canada, assignor to Walker & Dybvig, a partnership firm composed of Frank L. Walker and Henry G. Dybvig, in which the plaintiffs seek an injunction against any future acts of infringement and an accounting for damages and profits as to the alleged past acts of infringement.

2. The title to the patent and the exclusive rights thereunder in the plaintiffs and the jurisdiction of the court are admitted.

3. Plaintiffs are Lucy B. O'Leary, widow and assignee of the patentee William J. O'Leary, and The Rotor Clock Company, an Ohio corporation, as exclusive licensee.

4. Defendant, The Liggett Drug Company, is a corporation of the State of Delaware, having an established place of business in the city of Dayton, Ohio. This suit is being defended, however, by the manufacturers of the alleged infringing devices.

5. The accused device, as to each manufacturer respectively, is an electric motor installed in an electric clock as in Exhibits 8 and 10 herein.

6. Claims 3, 6 and 7 of the O'Leary patent in suit, are the only claims in issue. These claims are as follows: "3. A bi-polar synchronous motor of the core type comprising an unwound armature of magnetic material, said armature having a series of unwound pole salients; a field structure of magnetic material, said field structure having two unwound portions extending on diametrically opposite sides of said armature and which together embrace the major portion of said armature and each of said field portions having a series of unwound pole salients, the angular spacing of the salients on the rotor about its axis being the same as the angular spacing of the salients of the field about the same axis; and means of producing a reversing magnetic flux in said field structure to give said field portions opposite magnetic polarities whereby all of the salients of one of said field portions are north poles at a given instant and at the same instant all of the salients of the other of said field portions are south poles." "6. A single phase bi-polar synchronous motor of the core type comprising an unwound armature of magnetizable material, said armature having a series of circumferentially disposed unwound pole salients, a field structure of magnetizable material having at least two series of poles with similar pole salients thereon adjacent the path of rotation of the pole salients on the armature, the angular spacing of the centers of the pole salients on the armature about its axis being the same as the angular spacing of the centers of the pole salients of the field about the same axis; means for producing a reversing magnetic flux in the structure in such manner that the lines of force from the pole salients on the field through the pole salients on the armature pass through the armature in the direction of the plane of rotation thereof, and to magnetize the field structure salients to opposite magnetic polarity whereby all of the adjacent salients in one series of the field salients are north poles at a given instant and at the same instant all of the adjacent salients of the other series of the field operative on a different peripheral part of the armature are south poles." "7. A bi-polar synchronous motor of the core type having an armature provided with a plurality of unwound radial pole arms terminating in pole faces, a field core having a pair of poles each provided with a plurality of inwardly extending projections terminating in pole faces, the centers of the pole faces on the armature having the same angular spacing about the axis of rotation as the angular spacing of the centers of the pole faces of the field magnet about the same axis, and a winding linking the core for producing an alternating magnetic flux throughout the structure, whereby the lines of magnetic force acting on the armature lie in substantially the plane of rotation of the armature when said winding is energized from an alternating source of current."

7. The claimed invention of the patent in suit relates to what is termed in the specification and claims as a bi-polar synchronous motor of the core type. It comprises a stationary magnetic field or stator and a rotating member or rotor. The stator or electromagnet is composed of laminated soft iron in somewhat of a horseshoe shape or configuration with two opposite projecting limbs called "pole parts" that are formed integrally at one end of the horseshoe called the "yoke" and that at the outer or other end as stated in the specification "are spaced a considerable distance apart as shown at 23 in Fig. 1" of the patent drawings. Thus, there is a considerable air gap or space dividing the limbs of the stator into these two separated poles at the outer ends which serves to check or prevent the flow of the magnetic flux from the upper pole to the lower pole of the stator at these ends through this air gap. Each of the two poles of the stator are cut away so as to form projections, teeth or salients which are spaced apart peripherally by a distance equal to the peripheral length of a projection or salient. Two modifications are shown in the patent. In Fig. 1 there are three projections or salients on the upper pole of the stator and three on the lower pole or six in all. In Fig. 4 there are only two salients or projections on the upper pole and two corresponding projections or salients on the lower pole or four altogether. This means that the motor shown in the modification of Fig. 1 is adapted to run at a speed equal to the frequency of the electric current applied thereto divided by the number of the pairs of salients which with a sixty-cycle alternating current would mean sixty divided by three, or twenty revolutions per second or twelve hundred revolutions per minute. The modification of the motor of Fig. 4, on the other hand, has only two pairs of salients on the stator and the flux will,

therefore, rotate on the stator at a speed equal to sixty divided by two or thirty revolutions per second or eighteen hundred revolutions per minute. However, the rotor in this modification has five pole salients and, therefore, will rotate only four-fifths as fast as the flux so the speed of the rotor will be eighteen hundred times four-fifths or fourteen hundred and forty revolutions per minute.

8. The rotor or armature of the patented device is "adapted to revolve in an electromagnetic field created by an electromagnet 20" (Fig. 1). The rotor or armature is constructed of laminated iron and is described in the specification as being formed "of a number of sheets of soft iron arranged side by side to form a comparatively heavy and rather wide rotor member."

9. The principal features of the alleged invention as to all three of the claims in suit are, first, the motor being bi-polar in the sense of the magnetic field or stator design, mechanical arrangement and ·configuration comprising two separated poles or arms as expressed in Claim 3 "said field structure having two unwound portions extending on diametrically opposite sides of said armature", and as stated in Claim 6, "a field structure of magnetizable material having at least two series of poles with similar pole salients" and as stated in Claim 7, "a field core having a pair of poles each provided with a plurality of inwardly extending projections terminating in pole faces"; second, the provision in each of these three claims of each of the two stator poles being divided into projections, teeth or salients; third, that there is only one field winding or coil for the stator furnishing the means of producing a reversing magnetic flux in the structure when the winding or coil is connected with a source of electric current; and, fourth, that the rotor of the structure is unwound and has a series of pole salients cooperating with the series of pole salients on each of the two separate poles or limbs of the stator.

10. It is claimed that by virtue of this specific design and construction of the motor of the patent the patentee was enabled to maintain at any one given instant a magnetic polarity of the same kind in all of the series of salients of one stator pole or field portion and at the same instant the opposite magnetic polarity in all of the salients of the other stator pole or as stated in the claims "all of the salients of one of said field portions are north poles at a given instant and at the same instant all of the salients of the other of said field portions are south poles."

11. When the motor disclosed in the O'Leary patent in suit has been started into rotation either manually or by other devices not shown and the source of alternating current is applied thereto, any given salient on the magnetic field or stator will exert a pull or attraction on the approaching salient of the rotor thereby aiding rotation of the rotor to maintain its revolutions. As the magnetic polarization of this stator salient changes with the pulsation of the flux while the rotor salient is leaving from juxtaposition with it there is a slight opposition to rotation due to repulsion from the changes in magnetic polarities. However, the sum of the pulls assisting motion is greater than the sum opposing the same. The rotor of the motor is thus kept in motion. The continued rotation is also assisted by the relatively heavy and wide construction of the rotor in O'Leary as a result of the flywheel effect attributable to its design. The motor has no independent flywheel arrangement. The speed of the rotor in the O'Leary motor would be the same whether the stator or field poles had a plurality or a series of salients or only one salient or projection for each stator pole.

12. The principal defenses are invalidity, non-infringement and laches.

13. Holtz Patent No. 1,892,553 (not cited by the Patent Office) discloses and teaches all that is shown or claimed in the O'Leary patent in suit. The stator of Holtz is of the same general horseshoe construction of O'Leary having two pole pieces or limbs that are separated by a considerable space. Each one of these limbs is divided into two pole projections or salients that surround the major portion of the rotor. There is only one field winding of the stator of the Holtz device. The rotor of Holtz has salients or projections corresponding to the salients or projections of the O'Leary rotor· which rotor salients cooperate with the salients of the stator in the same manner as in the device of the patent-in-suit. The Holtz motor is a self-starting device which self-starting is accomplished by the placing of shading coils around one of the upper salients of the stator and a shading coil around one of the lower salients which cooperate with a squirrel-cage winding in the rotor. It

was demonstrated at the trial that the Holtz motor would operate as a non-self-starting motor if these shading coils and squirrel-cage windings were removed. The Holtz patent in its specification discloses that such a motor without the shading coil and squirrel-cage winding was well-known in the art.

14. Every feature claimed in the O'Leary patent-in-suit as to the O'Leary motor is fully shown and disclosed in the Holtz patent and in Rowe Patent No. 1,919,395 (not cited by the Patent Office), which is another example of what is shown in the Holtz patent.

15. The Coerper Patent No. 527,195 describes a motor comprising an armature or rotor made of laminated sheet iron pieces having radial arms and a magnetic field or stator with pole projections which embraces the rotor. There are two magnetic fields or stators in the Coerper device with just single windings around each stator these two stators being placed adjacent to each other and the magnetic poles of one stator at any given instant are the opposite of the magnetic poles of the other stator. However, it was well-known in the art that a reversal of these magnetic poles could be changed merely by the changing of the winding. It was again demonstrated in open court that the Coerper device would operate with one of the magnetic fields or stators removed. Practically the only difference between the Coerper device and the O'Leary device is that Coerper does not divide the salients of his stator into a series of at least two salients. However, to do this would not constitute invention.

16. The physical form of the O'Leary motor is also shown in the Thomson patent No. 545,554 and it required nothing more than a matter of design to one skilled in the art to cause the Thomson motor to function exactly as the O'Leary motor. This Thomson motor had only one field winding in the stator and a series of projections or salients in the stator corresponding to similar radial projections in the rotor, all of the salients on one side of the stator at a given instant being of the same magnetic polarity and all of the salients of the other portion of the stator being at the same time of opposite magnetic polarity, the same as in the O'Leary device. The rotor of Thomson did have a connection for the supplying of direct current to the rotor but this merely furnished greater torque to the rotor and the removal of this connection would merely reduce the efficiency of the motor and would not constitute any act of invention.

17. The exact physical form of the O'Leary structure as to its stator is shown in Fig. 1 of the early (1889) British patent to Atkinson No. 7895.

18. It would require nothing more than mechanical skill of one trained in the art to convert the device of the Thomson patent or the Coerper patent into the O'Leary device particularly in view of the Atkinson patent. The matter of alternating the polarization of stator salients is a mere matter of changing the windings of a coil well-known in the art. The British (1918) patent to Crompton, No. 115,475, likewise shows a bi-polar motor with a single winding for the purpose of producing excitation in the stator or magnetic field both the stator and rotor of Crompton being provided with projections or salients divided into teeth.

### Conclusions of Law.

1. Claims 3, 6 and 7 of the O'Leary patent-in-suit are completely anticipated by Holtz Patent No. 1,892,553 and Rowe Patent No. 1,919,395 and as a consequence Claims 3, 6 and 7 of the O'Leary patent-in-suit are invalid and void in law.

2. Claims 3, 6 and 7 of the O'Leary patent-in-suit are invalid and void in law as being anticipated by Coerper Patent No. 527,195, particularly in view of Thomson Patent No. 545,554, and British patent to Atkinson, No. 7895.

3. Claims 3, 6 and 7 of the O'Leary patent-in-suit are invalid and void in law as representing nothing more than mechanical skill and lacking a patentable act of invention over the prior art.

4. The patent-in-suit, and particularly Claims 3, 6 and 7 thereof, here in issue, is invalid because it lacks patentable invention as defined by the United States Supreme Court in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.

5. Claim 6 of the patent-in-suit is further invalid because it is ambiguous, too indefinite and has no support in the disclosure of the patent.

6. Plaintiffs' Bill of Complaint should be dismissed at Plaintiffs' costs, as prayed for by defendant in its answer.

Counsel may prepare and submit a decree accordingly.