**O'LEARY et al. v. LIGGETT DRUG CO.**

**SAME v. SEARS, ROEBUCK & CO.**

**SAME v. JOHNSTON–SHELTON CO.
OF OHIO.**

Nos. 9875, 9876, 9903.

Circuit Court of Appeals, Sixth Circuit.

July 23, 1945.

Marston Allen, of Cincinnati, Ohio (Allen & Allen, Marston Allen, and Theodore Greve, all of Cincinnati, Ohio, on the brief), for appellants.

Henry M. Huxley, of Chicago, Ill. (Irvin G. Bieser, of Dayton, Ohio, and Henry M. Huxley and Ralph Munden, both of Chicago, Ill., on the brief), for appellees Liggett Drug Co. and Sears, Roebuck & Co.

Rowan A. Greer, of Dayton, Ohio (Toulmin & Toulmin, H. A. Toulmin, Jr., and Rowan A. Greer, all of Dayton, Ohio, on the brief), for appellee Johnston-Shelton Co.

Before HICKS, SIMONS and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

On an application, dated November 11, 1927, letters patent, No. 1,971,793, entitled "electrical apparatus," were issued nearly seven years later on August 28, 1934, to William J. O'Leary of Montreal, Quebec, Canada, assignor to a partnership, Walker and Dybvig. The O'Leary apparatus had rough sledding in the United States Patent Office; for the primary examiner rejected the important claims of the application as anticipated in the prior art and as not involving invention. The board of appeals in the patent office, however, reversed the decision of the examiner, except as to one of the appealed claims. In its decision, the board declared: "While the structure and principle of operation of applicant's machine after being disclosed appears obviously quite simple, it is our opinion that the extreme simplicity indicates invention over the relatively complex structures disclosed by the references. We believe invention is involved in this radical simplification of the device in view of the differences in structure involved in accomplishing it. Neither the structure nor the exact principle of operation of applicant's device is anticipated by any of the citations and it is our opinion that invention is involved therein."

In three infringement suits, brought by Lucy B. O'Leary, assignee of the original patent assignees, Walker and Dybvig, and her exclusive licensee, the Rotor Clock Company, against three retailers, namely, the Liggett Drug Company, Sears, Roebuck & Company, and the Johnston-Shelton Co., the issue of patentability of the O'Leary electrical apparatus was presented to the United States District Court for the Southern District of Ohio.

While fifteen claims were contained in the O'Leary Patent, No. 1,971,793, only three claims, 3, 6 and 7, were placed in issue in the infringement suits; and, though retailers were named as defendants, the respective manufacturers of the alleged infringing clocks defended the suits, two of which were tried together and the third of which, that against the Johnston-Shelton Co., was tried separately but substantially on the same record, with additional testimony upon the issue of infringement. After consideration of all the evidence introduced at the trials, embracing oral testimony, both lay and expert, and numerous documents, drawings and physical exhibits; and, after observing, in open court, demonstrations of the operation of various machines and devices, the district court adjudged the patent claims in issue invalid for lack of invention and as anticipated in the prior art. The bills of complaint were dismissed, and from the final decrees of dismissal, Lucy B. O'Leary and the Rotor Clock Company have appealed to this court.

Claim 6 of the patent in suit, which the district court held to be "further invalid" because ambiguous, too indefinite and not supported in the disclosure of the patent, has been abandoned on this appeal, for the reasons stated by appellants that "there is no real difference between claims 6 and 7, and the electrical aspect of this case renders it complicated enough, without injecting unimportant issues." Claim 6, therefore, need not be considered.

The letters patent assert that O'Leary's invention "relates to devices which are adapted to operate at a synchronous speed, and more particularly to a synchronous device of this character having an unwound armature rotatably mounted in an electromagnetic field"; and that "another object of the invention is the provision of a synchronous device of this character which is simple in construction and which is adapted to operate smoothly at a speed which is constant and dependent only on the frequency of the alternating current supplied to the device." The patentee declares that other objects and advantages of his invention will be apparent ·from the drawings and the descriptions set forth in his specifications.

The claims of the patent, which are now in suit, read as follows:

"3. A bi-polar synchronous motor of the core type comprising an unwound armature of magnetic material, said armature having a series of unwound pole salients; a field structure of magnetic material, said field structure having two unwound portions extending on diametrically opposite sides of said armature and which together embrace the major portion of said armature and each of said field portions having a series of unwound pole salients, the angular spacing of the salients on the rotor about its axis being the same as the angular spacing of the salients of the field about the same axis; and means of producing a reversing magnetic flux in said field structure to give said field portions opposite magnetic polarities whereby all of the salients of one of said field portions are north poles at a given instant and at the same instant all of the salients of the other of said field portions are south poles."

"7. A bi-polar synchronous motor of the core type having an armature provided with a plurality of unwound radial pole arms terminating in pole faces, a field core having a pair of poles each provided with a plurality of inwardly extending projections terminating in pole faces, the centers of the pole faces on the armature having the same angular spacing about the axis of rotation as the angular spacing of the centers of the pole faces of the field magnet about the same axis, and a winding linking the core for producing an alternating magnetic flux throughout the structure, whereby the lines of magnetic force acting on the armature lie in substantially the plane of rotation of the armature when said wind-ing is energized from an alternating source of current."

Illustrative Figure 1 of the O'Leary Patent reveals a horseshoe shaped magnet structure, around the intermediate leg of which is shown a coil for alternating electric current, which is the source of power utilized in the operation of the device. Two poles are thus set up in the magnet or field, shifting with the alternations in the current applied to the coil. Thus, the structure is bi-polar, and the motor is of the core type, inasmuch as the winding is around the core of the structure and not around the poles. Each pole is divided into teeth, or salients, the drawing showing only three salients on one of the poles and three on the other. All three salients of one pole will have the same and not opposite polarity at the same time; and, likewise, all the three salients of the opposite pole will have the same polarity, and not opposite polarity, at the same time, but these salients will be of opposite polarity to those of the pole on the other side of the horseshoe. The rotor, which is an armature composed of laminations of soft iron, displays teeth, which are spaced alike to the salients on the field magnet so that at any instant when the active face of one tooth of the rotor is directly opposite any pole salient of the stator field magnet structure, all the pole salients of the stator will have an armature tooth face opposite them. At any instant, the polarities of the rotor teeth are determined by the polarities of the adjacent stator pole salients. That is to say, when the three salients of the upper pole of the stator are north, the adjacent rotor projections will be south. At that same instant, the three salients.of the lower pole of the stator are south and the adjacent rotor pole projections will be north. At the next alternation of the current in the winding, the stator salients have their polarities reversed and, therefore, cause opposite polarities in the adjacent rotor teeth, or projections. The changes in flux flow follow the changes in the magnetizing current in the winding almost instantaneously.

Counsel for appellants stress that, as differentiated from previous motors, the path of magnetic flux goes directly across the O'Leary rotor, instead of moving through the periphery of the rotor from one stator pole to the next; and that the lines of magnetic force pass directly through the armature and, in consequence of the two-polar arrangement, must traverse the armature

"not tangentially but directly across it." They say that the O'Leary arrangement forces each rotor tooth, as it moves from one projection to the next projection on any pole, to change its polarity, "because the alternating current applied to the magnet would have, during the interval of movement, changed polarities on all of the adjacent projections."

In his specifications, O'Leary explains: "It will be understood that if the device is brought up to its synchronous speed in any suitable manner the motor will continue to operate at its synchronous speed on the current supplied to the winding 26, the operation of the motor being caused by the attractive force of the pole projections of the electro-magnet to the approaching pole salients of the armature, while the latter is rotating at a synchronous speed. As the pole salients of the armature pass the position shown in Fig. 1 where they are immediately adjacent and radially opposite respective pole projections of the field magnet, or after they have progressed slightly from this position, the total number of lines of force created in the field magnet will be rapidly reducing, due to the reversal of the direction of the current through the coil 26, so that there will be only a small magnetic force tending to resist the progress of any one pole salient of the armature to the next succeeding pole projection of the field magnet."

In simpler language, appellants' attorneys state that the essence of the O'Leary Patent is that, if you take a horseshoe-shaped piece of iron and wrap a coil around the intermediate part, cut some teeth in the jaws of the horseshoe where they face each other, mount an iron pin wheel so that it can rotate between the jaws, spacing the pins on the wheel like the teeth on the horseshoe jaws, and then pass an alternating current through the coil and give the pin wheel a spin, you will find that the device will operate as a motor, in time with the alternations of the current.

They insist that O'Leary was the first to provide "a motor with a bi-polar stator, thus requiring but a single coil and connections thereto, and with a toothed armature or rotor which was unwound, and required no electrical connections, yet provided for multiple stator projections by cutting each of the two poles of the stator into a number of teeth."

They contend that no one before O'Leary ever made a motor for alternating current which had a multiple of magnet teeth and, at the same time, was as simple as his; that the invention is one of "simplification" in the working out of a new theory whereby the inventor was able to omit parts of prior devices, previously considered necessary, with the resultant production of an inexpensive electric motor, satisfying a long felt need for a cheap motor for electric clocks; and that there was immediate commercial acceptance of O'Leary's accomplishment, followed by widespread conversion of the industry to its use after the device had been exhibited generally.

Appellants place emphasis upon the five-to-four decision of the Supreme Court in Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Company, 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 594, 88 L.Ed. 721, wherein Mr. Justice Roberts said: "Viewed after the event, the means Anthony adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention. During a period of half a century, in which the use of flashlight batteries increased enormously, and the manufacturers of flashlight cells were conscious of the defects in them, no one devised a method of curing such defects. Once the method was discovered it commended itself to the public as evidenced by marked commercial success. These factors were entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability. Accepting, as we do, the findings below, we hold the patent valid and infringed." The patent was for a leak-proof dry cell for a flashlight battery, no patent in the prior art having addressed itself to the problem of preventing both leakage and swelling in a dry cell. In the case before us, it would seem that there was no problem presented of curing defects; nor did the inventor devise a new combination of old elements to produce a new result. It is noteworthy that the Supreme Court stated that the District Judge had made findings which had support in the evidence; that the Circuit Court of Appeals had re-examined these findings in the light of the evidence and had accepted them; and that it must be a strong case in which the Supreme Court will set aside such concurrent findings. Williams Manufacturing Co. v. United Shoe Machinery Corporation, 316 U.S. 364, 367, 62 S.Ct. 1179, 86 L.Ed. 1537, was cited to this effect. This rule would

appear to be the basis upon which the decision was rested.

In support of their contention that the patent claims in suit should be sustained as invention by simplification in a reorganization of parts or process steps to accomplish a like object to old structures with a lesser number of parts or steps, appellants cite Lawther v. Hamilton, 124 U.S. 1, 7, 8 S.Ct. 342, 345, 31 L.Ed. 325, wherein Mr. Justice Bradley said that a discovery was patentable when shown to be highly useful and to have been "the result of careful and long-continued experiments, and the application of much ingenuity." By omission of one of the former steps of the former process and in improving the process in the use of old mixing machinery, the inventor achieved a great improvement in result. As a further urge to the application here of their so-called doctrine of invention by simplification, appellants cite Aronson v. Toy Devices, 3 Cir., 1 F.2d 91, 92; Dececo Co. v. George E. Gilchrist Co., 1 Cir., 125 F. 293, 298; Union Special Mach. Co. v. Quaker City Four Mills Co., D.C.E.D.Pa., 236 F. 246, 250; Edison Electric Light Co. v. United States Electric Lighting Co., 2 Cir., 52 F. 300. In the last cited case, involving a patent issued to Thomas A. Edison for an incandescent electric lamp, much more was involved than mere simplification. The other cases seem clearly out of line with more modern authority. As this court said in United States Gypsum Co. v. Consolidated Expanded Metal Companies, 6 Cir., 130 F.2d 888, 892: "Older cases are not very helpful. The patent law is presently in a state of flux. Much water has flowed over the patent dam and we must recognize as have other courts and our own (Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 108 F.2d 109) 'the high standard demanded for invention by the decisions of the Supreme Court in recent years,' (Buono v. Yankee Maid Dress Corporation, 2 Cir., 77 F.2d 274, 276)."

Dunn Mfg. Co. v. Standard Computing Scale Co., 6 Cir., 163 F. 521, though not discussed in the briefs of appellees, is perhaps the strongest of the old authorities in the patent law presented by appellants in support of their position. The case was decided by this court in 1908 in an opinion by Judge Lurton; and would firmly buttress the argument of appellants except for the change in concept of patentable invention to which we have adverted. We doubt if the elimination of certain parts of prior

machines and the simplification of their mechanism in the Dunn computing cheese cutter, held in that case to disclose invention as producing a better and more practicable and saleable machine, could now be held to constitute invention. See Mathews Conveyor Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 89; Ranco, Inc., v. Gwynn, 6 Cir., 128 F.2d 437, 442, 443; Page Steel & Wire Co. v. Smith Bros. Hardware Co., 6 Cir., 64 F.2d 512, 514; Seiberling Rubber Co. v. I. T. S. Co., 6 Cir., 134 F.2d 871, 874, 875; Detachable Bit Co. v. Timken Roller Bearing Co., 6 Cir., 133 F.2d 632, 637; Nestle-Le Mur Co. v. Eugene, 6 Cir., 55 F.2d 854; Blackmore v. Ford Motor Co., 6 Cir., 56 F.2d 806. These later cases in our circuit evince that a higher standard of inventive concept than mere simplification is now required.

Our later opinions, cited above, conform to those in other circuits. In Utah Radio Products Co. v. General Motors Corporation, 2 Cir., 106 F.2d 5, it was held that the mere discarding of an unwanted part of a prior device, together with the function it performs, leaving the remaining elements to act as before and decreasing the size of the device, did not constitute invention. See also S. S. White Dental Mfg. Co. v. J. A. Fischer Co., 2 Cir., 100 F.2d 389, 390, where it was said that the claimed disclosure was at most "but the non-inventive act of leaving off a part used to cover the wire; omitting the function of that part; and relying only upon distortion by swaging to form the terminal tip and prevent uncoiling." The omission of an element of a prior device, together with omission of its function, does not constitute invention. Grayson Heat Control, Limited, v. Los Angeles Gas Appliance Co., Inc., 9 Cir., 13 F.2d 478. To the same effect, see In re Listen, Cust. & Pat. App., 136 F.2d 719, 721.

As early as Dunbar v. Myers, 94 U.S. 187, 199, 24 L.Ed. 34, it was declared to be settled law that the mere carrying forward of an original patented conception, involving only change of form, proportions, or degree, or the substitution of equivalents, is not such invention as will sustain a patent, even though the changes may produce better results. See also Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 27 L.Ed. 438. The Supreme Court declared in Richards v. Chase Elevator Co., 159 U.S. 477, 486, 487, 16 S.Ct. 53, 54, 40 L.Ed. 225, that, "while the omission of an

element in a combination may constitute invention, if the result of the new combination be the same as before; yet if the omission of an element is attended by a corresponding omission of the function performed by that element, there is no invention, if the elements retained performed the same function as before." The court expressed the unanimous opinion that the apparatus lacked the necessary quality of invention, inasmuch as to make a combination of old elements patentable there must be some new result accomplished, the apparatus for which patentability was claimed being a mere aggregation of the several functions of the different elements of its combination, each performing its old function in the old way.

We have given thoughtful consideration to the opinion in Dunham v. Kelley-Koett Mfg. Co., 6 Cir., 246 F. 845, 848, relied upon by appellants. There, Judge Denison said that though, after the fact, it was easy to say that no invention was required to substitute the well known Wehnelt interrupter for the well known mechanical interrupter, the difference between inefficiency and comparative efficiency in the electrical field "is often the result of such seemingly trifling changes and of such obscure causes that we think the merit of invention may be attributed to the forward step which Churcher took."

 Even under the current "flash of creative genius" doctrine, the creative flash in the mind of the inventor in the electrical field need not qualify him as a Volta or an Ohm, an Edison or a Faraday. To be the inventor of a patentable device, however, one must exercise more ingenuity than a mechanic skilled in the art; must do more than utilize the skill of the art in bringing old tools into new combinations; and must produce a device which is not merely an advance indicated by prior art, but is the result of invention and not of a mere exercise of the "skill of the calling." Perfection of workmanship, though greatly increasing convenience, extending use, or diminishing expense, is not patentable. The contribution of the inventor must reach the level of inventive genius which the Constitution authorizes Congress to reward. These principles have been stated by the Supreme Court in Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58, and the district court attempted to apply them to the instant controversy in expressly holding that the claims of the patent in suit are invalid as lacking patentable invention as defined in the Cuno case. Cf. Sinclair & Carroll Company, Inc. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143.

The trial court filed its decision, findings of fact, and conclusions of law as one document. Among its conclusions, the court considered the claims of the patent in suit to be invalid as anticipated by Coerper Patent No. 527,195, particularly in view of Thomson Patent No. 545,554, and the British Patent to Atkinson, No. 7895. The following findings of fact supported this conclusion:

"The Coerper Patent No. 527,195, describes a motor comprising an armature or rotor made of laminated sheet iron pieces having radial arms and a magnetic field or stator with pole projections which embraces the rotor. There are two magnetic fields or stators in the Coerper device with just single windings around each stator, these two stators being placed adjacent to each other, and the magnetic poles of one stator at any given instant are the opposite of the magnetic poles of the other stator. However, it was well known in the art that a reversal of these magnetic poles could be changed merely by the changing of the winding. It was again demonstrated in open court that the Coerper device would operate with one of the magnetic fields or stators removed. Practically the only difference between the Coerper device and the O'Leary device is that Coerper does not divide the salients of his stator into a series of at least two salients. However, to do this would not constitute invention.

"The physical form of the O'Leary motor is also shown in the Thomson Patent No. 545,554, and it required nothing more than a matter of design to one skilled in the art to cause the Thomson motor to function exactly as the O'Leary motor. This Thomson motor had only one steel winding in the stator and a series of projections or salients in the stator corresponding to simlar radial projections in the rotor, all of the salients in the stator corresponding to simi-instant being of the same magnetic polarity and all of the salients of the other portion of the stator being at the same time of opposite magnetic polarity, the same as in the O'Leary device. The rotor of Thomson did have a connection for the supplying of direct current to the rotor but this merely furnished greater torque to the rotor and the removal of this connection

would merely reduce the efficiency of the motor and would not constitute any act of invention.

"The exact physical form of the O'Leary structure as to its stator is shown in Fig. I of the early (1889) British Patent to Atkinson No. 7895.

"It would require nothing more than mechanical skill of one trained in the art to convert the device of the Thomson patent or the Coerper patent into the O'Leary device particularly in view of the Atkinson patent. The matter of alternating the polarization of stator salients is a mere matter of changing the windings of a coil well-known in the art. The British (1918) patent to Crompton, No. 115,475, likewise shows a bi-polar motor with a single winding for the purpose of producing excitation in the stator or magnetic field, both the stator and rotor of Crompton being provided with projections or salients divided into teeth."

Even more emphatically, the district court concluded that the claims of the patent in suit are invalid, as "completely anticipated" by Holtz Patent No. 1,892,553, and Rowe Patent No. 1,919,395. This conclusion was based upon the following findings of fact:

"Holtz Patent No. 1,892,553 (not cited by the Patent Office) discloses and teaches all that is shown or cla'med in the O'Leary patent in suit. The stator of Holtz is of the same general horseshoe construction of O'Leary having two pole pieces or limbs that are separated by a considerable space. Each one of these limbs is divided into two pole projections or salients that surround the major portion of the rotor. There is only one field winding of the stator of the Holtz device. The rotor of Holtz has salients or projections corresponding to the salients or projections of the O'Leary rotor which rotor salients cooperate with the salients of the stator in the same manner as in the device of the patent in suit. The Holtz motor is a self-starting device which self-starting is accomplished by the placing of shading coils around one of the upper salients of the stator and a shading coil around one of the lower salients which cooperate with a squirrel-cage winding in the rotor. It was demonstrated at the trial that the Holtz motor would operate as a non-self-starting motor if these shading coils and squirrel-cage windings were removed. The Holtz patent in its specification discloses that such a motor without the shading coil and squirrel-cage winding was well known in the art.

"Every feature claimed in the O'Leary patent in suit as to the O'Leary motor is fully shown and disclosed in the Holtz patent and in Rowe Patent No. 1,919,395, (not cited by the Patent Office) which is another example of what is shown in the Holtz Patent."

In its decision, the district court declared that "the difference in structure recited in the claims in suit with respect to the disclosure of this Holtz Patent amounts merely to the omission by O'Leary of the self-starting feature, together with its function—an omission which any mechanic skilled in the electrical art must have fully understood before O'Leary entered the field." [53 F.Supp. 290]

It is obvious from the discussion in the decision that the district court was much impressed with the demonstration at the trial of a motor precisely like the disclosure of the Holtz patent, which operated perfectly as a self-starting synchronous motor; and that a modified motor precisely like the disclosure of the Holtz patent, except that the shading coils were omitted from the field poles and the squirrel-cage winding was omitted from the motor, operated perfectly as a synchronous motor after it had been started in operation manually. The court stated that it had been demonstrated that the rotor of the modified motor had no residual magnetism, and that its operation was the same as the O'Leary motor, which also must be started manually. The assertion was made by the district court that there was substantial agreement that the Rowe patent is similar in construction and in mode of operation to the Holtz patent.

Entertaining no doubt as to the invalidity of the patent in suit, the district court considered that "commercial success" has no bearing upon the issues. United States Gypsum Co. v. Consolidated Expanded Metal Companies, 6 Cir., 130 F.2d 888, 893, 894, supra; Carroll-Thomson Co. v. Central Brass & Fixture Co., 6 Cir. 22 F.2d 253, 254. Likewise, no necessity was found for the decision or discussion of the issues of infringement in the three suits, or of any other questions presented by the pleadings.

■ We shall now undertake a discussion of the prior art found by the district court to anticipate the claims of the O'Leary patent in suit, and shall first ad-

vert to Coerper Patent No. 527,195. Appellants contend that, neither structurally nor theoretically is Coerper an anticipation of O'Leary. They say that the Coerper motor differs from O'Leary's physically in that it uses more than one field magnet, and four poles rather than a bi-polar structure, adjacent poles being of opposite polarity at all times; and that, taking any single one of the field magnets, its tips are not divided into teeth or salients. They assert that the specifications of Coerper indicate that there is remanent magnetism in the radial arms of the rotor, which he takes into consideration in so arranging his field poles that each rotor tooth can retain a uniform polarity; that his electrical theory, disregarded by O'Leary, was that a rotor tooth could not be required to change its polarity when moving from one adjacent pole to the next; and that the motor which he built conformed to his theory and maintained identical polarity of each rotor tooth throughout its path of serial steps from one magnet tip to the next.

The short answer to this argument was the demonstration at the trial that a motor, built in accordance with the Coerper patent and possessing no residual magnetism in the rotor, operated successfully. An expert witness made a practical demonstration of the operation of the Coerper motor with only one field magnet, with two salients per pole, explaining thereby that there is no difference in principle of operation between the Coerper motor, using one field magnet with two salients per pole, and the same motor using one field magnet with a single salient per pole, or two field magnets with a total of four pole salients. The addition of extra salients to each field pole of Coerper was suggested in the prior art, notably in the Thomson Patent No. 545,-554, and the British Patent to Crompton, No. 115,475. From the expert testimony, it is fair to infer that in function it is immaterial whether adjacent pole salients on the two field magnets of Coerper are of like, or of unlike, polarity. The expert witness Fox was of the opinion that the operation of the Coerper motor cannot be explained on the theory of residual or remanent magnetism. His opinion seems supported by the discussion of Steinmetz in his "Theory and Calculations of Electrical Apparatus," published in 1917. From the testimony of the expert Fox and his demonstration that the Coerper motor operated in the same manner with one field winding reversed, it would seem that no invention would inhere in the reversal by O'Leary of the connections to one of Coerper's field coils. And so, both from autoptic preference and from the expert testimony, it cannot be said that the findings of the district judge as to the Coerper anticipation were clearly erroneous.

█ In rejecting O'Leary's claims, the primary examiner in the patent office stated that the modification of the motor in the Coerper patent involved only a problem of design and was not such a forward step in the art as to amount to invention. But the board of appeals in the patent office stated that no two adjacent poles of the same polarity on any particular phase of the current was found in Coerper as is true in O'Leary. There is some merit in the contention of the appellees that the Coerper motor was misunderstood by the patent board of appeals, as a result of erroneous representation; and that, therefore, less weight attaches to the finding of the board in that particular than would ordinarily be accorded. However, this controversy is considered of insufficient importance to require further comment.

Appellants challenge the statement of the district court in its decision that the physical form of the O'Leary motor is shown in Thomson Patent No. 545,554; and assert that Thomson spaced his rotor and stator poles alike, and employed a wound rotor. They say further that in electrical theory Thomson, like Coerper, provided for rotor poles of permanent alternate polarities impressed upon them from an outside source; and that Thomson placed coils on his rotor teeth with the windings arranged alternately, so that the polarity of the teeth will be alternately north and south around the wheel. Their argument is that, since the poles on the stator of the Thomson structure are spaced two rotor teeth apart and since the current is alternating, there will always be a south pole presented to a north pole tooth and a north pole presented to a south pole tooth, which follows the same principle of attraction and repulsion which they claim was applied by Coerper. They contend that O'Leary dispensed with the underlying electrical theory which required alternate north and south poles on the rotor created and maintained by separate winding and current supply.

Upon inspection of the Thomson patent, it appears, however, that the motor is bi-polar, with its stator having a single field winding energized from an alternating current source with each of the poles of the bi-polar construction divided into a series of pole salients, whereby all the salients of one pole of the stator are north magnetic poles at a given instant and, at the same instant, all the salients of the other pole of the stator are south magnetic poles.

The fact that the Thomson motor is supplied with a direct current was, according to expert testimony, for the purpose of developing more torque, or power. Indeed, the title of the Thomson patent is "Alternating-Current Generator or Motor." The testimony demonstrated, moreover, that the Thomson patent provides for a reaction-type synchronous motor, which operates at the same speed whether the winding upon the rotor projections are energized, or not. Inasmuch as only synchronous speed is of importance in the manufacture of small motors, such as those for clocks, the omission of a direct current, diminishing only torque, would hardly be of inventive concept.

Nor would the decrease of the number of polar salients on Thomson's rotor seem inventive in the light of the prior art, or the omission of the windings and connections of the rotor projections of Thomson, with the consequent omission of their functions. Considering fully the testimony of the experts and their theoretical explanations of advanced problems in the electrical field, presented upon this record, we fail to find justification for the conjecture of the board of patent appeals that operation of the O'Leary motor "is possibly due to the magnetic lag or hysteresis in the rotor cooperating with the momentum of its rotary movement, the poles of the stator serving to respectively pull and repel in sequence the poles of the rotor on each shift in phase, thereby maintaining a synchronous speed in respect to the poles or a fixed ratio of synchronous speed in respect to the number of poles as a whole." It would seem that O'Leary, himself, disclaimed this theory when, in his specification, he said: "As the pole salients of the armature pass the position shown in Fig. I where they are immediately adjacent and radially opposite respective pole projections of the field magnet, or after they have progressed slightly from this position, the total number of lines of force created in the field magnet will be rapidly reducing, due to the reversal of the direction of the current through the coil 26, so that there will be only a small magnetic force tending to resist the progress of any one pole salient of the armature to the next succeeding pole projection of the field magnet." At the trial appellees' expert Fox testified that the O'Leary motor does not utilize remanent magnetism; and appellant's expert Dybvig, in discussing repulsion and attraction of rotor poles, testified that, in O'Leary, there are "no such two forces acting upon the rotor."

Appellants concede that, as found by the district court, the form of the stator of the O'Leary structure is shown in the British Patent to Atkinson No. 7895, but say that both an alternating current and a direct current, as applied in the Thomson patent, would be required to make the Atkinson device work as a motor. No comment upon this point seems necessary in view of our previous discussion.

The findings of the district court with respect to Thomson Patent 545,554, and the statement that no more than mechanical skill of a person skilled in the art would be required for the conversion of the devices described in the Thomson and the Coerper patents into the O'Leary apparatus, particularly in view of the teaching in the British patent to Atkinson, are supported by substantial evidence and could not be appropriately termed clearly erroneous.

In the opinion of the district court, the most impressive prior art was exhibited in Holtz Patent No. 1,892,553, and Rowe Patent No. 1,919,395, which were regarded as completely anticipating the claims of O'Leary in suit. Neither of these patents was cited in the patent office. The issuance of a patent creates no presumption of validity sufficient to overcome a pertinent prior art reference which has not been considered in the patent office. See Lempco Products, Inc., v. Timken-Detroit Axle Co., 6 Cir., 110 F.2d 307, 310. Had these patents been before the board of appeals for consideration, it is possible that the decision of the primary examiner rejecting the claims of O'Leary would not have been reversed.

The findings of the district court embrace a succinct comparison of the Holtz patent with that of O'Leary. But a more detailed description and discussion of the Holtz patent, in relationship to O'Leary, would seem appropriate upon this appeal.

The Holtz patent declares that the invention relates to alternating current motors and in particular to motors of the induction reaction type. The specifications state that the inventor's improved motor may be designed for various synchronous speeds and is applicable to various uses, particularly where a small self-starting synchronous motor is desired, such as *in the operation of timing devices.*

Holtz specifies that the stator of his motor is of a usual construction and comprises a single phase bi-polar laminated field magnet on which is mounted a coil, which constitutes the primary winding of the motor and is to be connected to an alternating source of supply. The opposite faces of the poles of the field magnet are so curved that a cylindrical opening is provided between them in which the rotatably mounted armature of the motor is located. The inventor states that these poles are each provided with shading coils mounted on the pole tips in a manner well known to those familiar with the art; and that the shading coils serve to change the pulsating flux of the field into a so-called shifting, or substantially rotating, magnetic field in the cylindrical space between the opposite poles of the field magnet.

Holtz describes a stator not materially differentiable from that described by O'Leary. Both stators constitute a horseshoe of laminated material, which can be readily magnetized, with two separated opposite pole limbs. Each pole limb is divided into a series of pole salients. The ends of the electromagnetic limbs in both patents are spaced considerably apart, with one end of the pole parts integrally formed with the yoke which serves as a core, around which a single energizing coil for connection with an alternating current is placed. Each patent calls for the construction of a stator having a pair of poles, each provided with several inwardly extending projections terminating in pole faces.

In describing his rotor, Holtz states that it comprises a magnetic core member made up of laminations and a squirrel-cage winding thereon consisting of bars and plates which serve as end rings for the squirrel cage; that the rotor is mounted on a shaft provided with pivot pins which fit into suitable bearing plugs secured in non-magnetic yokes bridging the cylindrical air gap of the field member. By these means the rotor is symmetrically rotatably mounted within the cylindrical space between the pole faces. Holtz states that the particular feature of novelty in his improved motor is embodied in the rotor.

In the modifications illustrated in Figs. 1 and 4 the laminations are provided with six symmetrically spaced slots and the six squirrel-cage bars are symmetrically located in the bottoms of these slots. Holtz asserts that an arrangement of the field structure and the rotor, as described, without squirrel-cage winding, produces what in electrical terminology is known as a variable reactance. He elucidates further that, if, in such combination, an alternating current voltage be applied to the terminals of the coil, it will be found that the current resulting from this supply voltage will not be the same for different positions of the rotor; and that if the rotor is slowly rotated on its axis, the current will vary between a given maximum and minimum value and the number of such changes for each revolution will depend upon the number of slots, or salient poles, in the rotor. He declares that "it is well known in the art that such an arrangement is capable of delivering a small amount of mechanical power when the rotating member is brought up to a speed such that this reactance pulsates at twice the line frequency of the alternating current supply." He adds that the amount of power that such motor will deliver at this synchronous speed is greater if the stator has salient poles as distinguished from distributed poles, but that it is still open to the objection that it has only a low maximum torque at its synchronous speed, very low pull-in torque, and no starting torque. The inventor then states: "To overcome these objectionable features, I provide the rotor of such a motor with the squirrel-cage winding as illustrated." Eliminating consideration of the squirrel-cage winding, which Holtz provides for in his rotor, its similarity to O'Leary's rotor becomes apparent.

The only essential difference between the motors shown in the Holtz and O'Leary patents, respectively, appears to be the provision by Holtz for shading coils around one of the salients of the stator and a corresponding shading coil around one of the salients of the other pole projection in conjunction with the squirrel-cage windings on the Holtz rotor. The expert witness Fox testified and demonstrated that the Holtz motor, constructed without the wind-

ing coils and the squirrel-cage winding, operates at the same speed as O'Leary's motor. He described the squirrel-cage winding and the windings of the shading coils as similar in function to the starter of an automobile engine; and stated that this equipment was, in his opinion, added by Holtz for the purpose of making a well-known reaction type of synchronous motor self-starting. The testimony and the demonstration of this expert witness supports the finding of the district court that it had been demonstrated at the trial that the Holtz motor would operate as a non-self-starting motor if the shading coils and squirrel-cage winding were removed. The able district judge, of clear eyesight, keen judgment and wide experience in the adjudication of patent litigation, obviously applied the common-sense adage, "seeing is believing."

There is apparently no controversy concerning the fact that the Rowe Patent No. 1,919,395, is similar to Holtz in disclosing the same general arrangement, the same two divisions of stator poles, and the same mode of operation.

The inventor Holtz, as found by the district court, discloses all essentials of the O'Leary patent claims for a non-self-starting motor; and teaches, additionally, how a motor of the O'Leary type is made self-starting. It thus appears that when stripped of the self-starting features of Holtz, the claims in suit read, in substance, equally as well upon Holtz as upon O'Leary. The stripping of the shading coils from the salients and the stripping of the squirrel-cage winding from the armature amount to no more than the omission from the disclosure of Holtz of the self-starting feature of his motor. From the evidence, the district court was justified in its finding that such omission does not rise to the dignity of invention, but represents nothing more than the exercise of mechanical skill by one skilled in the electrical art.

■ Whether an improvement requires mere mechanical skill or the exercise of the faculty of invention is a question of fact. Thomson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, 446, 44 S.Ct. 533, 68 L.Ed. 1098; Williams Manufacturing Co. v. United Shoe Machinery Corporation, 316 U.S. 364, 367, 62 S.Ct. 1179, 86 L.Ed. 1537, affirming 6 Cir., 121 F.2d 273; Stubnitz-Greene Spring Corporation v.

Fort Pitt Bedding Co., 6 Cir., 110 F.2d 192, 196.

Much time in the argument and space in the briefs of appellees have been devoted to the point that Spencer Patent No. 1,708,334, and the prior knowledge and use of that inventor, particularly in view of the British Patent to Crompton No. 115,-475, anticipates O'Leary in the disclosure of a synchronous motor of the same type operating upon the same principles. The controversy concerning Spencer involves the effect of the disclosures in his abandoned application and the determination of issues of fact pertaining to his prior use. The district court ignored Spencer in its decision, findings of fact and conclusions of law. In the circumstances, no occasion appears for a commentary by this court upon Spencer.

■■ Likewise, there is no necessity for an historical narrative of the worthy struggles of O'Leary, the industrial history of his device, and its commercial success. Commercial success alone will not vitalize an invalid patent, but will tip the scales in favor of validity only when otherwise there is doubt as to the patentability of asserted claims. United States Gypsum Co. v. Consolidated Expanded Metal Companies, 6 Cir., 130 F.2d 888, 894. Cf. Hanovia Chemical & Manufacturing Co. v. David Buttrick Co., 1 Cir., 127 F.2d 888, 894. Only when, in a close case, the question of invention is in doubt, do commercial success and the filling of a long-felt want become relevant considerations. Dow Chemical Company v. Halliburton Oil Well Cementing Company, 324 U.S. 320, 65 S.Ct. 647, affirming 6 Cir., 139 F.2d 473, 477.

■ In Hazeltine Corporation v. Crosley Corporation, 6 Cir., 130 F.2d 344, 349, we pointed out that, with respect to the findings of fact of a United States district court concerning the validity of a patent, the courts of appeal must, in duty bound, apply the mandate of Civil Procedure Rule 52(a), 28 U.SC.A. following section 723c that "findings of fact shall not be set aside unlessly clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." See to same effect: Green v. Electric Vacuum Cleaner Co., 6 Cir., 132 F.2d 312, 314.

■ Other circuits, likewise, have interpreted Rule 52 as applicable to the find-

ings of fact by the district court in patent cases. Webb v. Frish, 7 Cir., 111 F.2d 887, 888; Strong-Scott Mfg. Co. v. Weller, 8 Cir., 112 F.2d 389, 393; Otis Pressure Control v. Guiberson Corporation, 5 Cir., 108 F.2d 930, 932. And, without express reference to the civil procedure rule, circuit courts of appeal have recognized the doctrine that, in patent cases, the findings of fact of the trial court, if supported by substantial evidence, should not be set aside unless clearly erroneous. Antonsen v. Hedrick, 9 Cir., 89 F.2d 149, 151; Ruth v. Climax Molybdenum Co., 10 Cir., 93 F.2d 699, 702; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199. Cf. Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., 3 Cir. 105 F.2d 941, 942.

■ The fact that proposed findings of fact, prepared and submitted by the successful attorneys, have been adopted by the trial court does not detract from their legal force or effect. When adopted, such findings become the findings of the court, and are entitled to the same respect if the judge, himself, had drafted them. Simons v. Davidson Brick Co., 9 Cir., 106 F.2d 518, 521.

It should be observed, moreover, that in a patent case, where the claims were held valid and infringed, the Supreme Court has declared that it will not disturb the concurrent findings of fact of the district court and the circuit court of appeals, where there is "evidence to support them." Williams Manufacturing Co. v. United Shoe Machinery Corporation, 316 U.S. 364, 367, 62 S.Ct. 1179, 1181, 86 L.Ed. 1537.

■ Certainly, there is abundant substantial evidence in the instant case to support the finding of the district court that the patent claims in suit are invalid; and it cannot be correctly said that the findings are clearly erroneous. The decree of the district court, accordingly, must be upheld.

■ The patent claims in suit being invalid, we will not decide or discuss the issues of infringement, upon which the district court made no findings. In Hazeltine Corporation v. Crosley Corporation, 6 Cir., 130 F.2d 344, 349, supra, we asserted that, in patent cases as well as in mill-run civil actions, a reviewing court would violate both the letter and the spirit of Civil Procedure Rule 52, should it pass upon a controverted issue of fact not determined in the trial court. There, the district court,

having held the patent claims in suit not to be infringed, had made no findings and had drawn no conclusions with respect to the validity of the patent. In the present case, having held the patent claims invalid, the district court made no findings with respect to infringement. The same reasoning applies. On this review, the issues of infringement should not be passed upon. In Dow Chemical Company v. Halliburton Oil Well Cementing Company, 324 U.S. 320, 65 S.Ct. 647, supra, the Supreme Court expressly pretermitted decision upon infringement in like circumstances.

The final decrees of the district court in all three cases are affirmed.