Estate of Edward T. ARCY, Deceased, Della E. Arcy, Personal Representative, and Della E. Arcy, Individually, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 81–70141.**

United States District Court, E.D. Michigan, S.D.

Nov. 18, 1983.

Edward J. Fletcher, Detroit, Mich., for plaintiffs.

Allen R. Mass, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THORNTON, District Judge.

This matter came on to be heard upon the complaint of the Plaintiffs and attached exhibits, the Answer of the Defendant, the Stipulation of the Parties, the Plaintiffs' Brief, the Answering Trial Brief of the Defendant, a replied Brief of the Plaintiffs

to the Answering Trial Brief of the Defendant, the Plaintiffs' Supplemental Statement in Rebuttal to Defendant's Oral Arguments, and a hearing by the Court of the arguments of respective counsel.

The Plaintiffs define the issues involved in the litigation as follows:

I. The Dominant Motivation of Plaintiff, EDWARD T. ARCY, SR., in personally guaranteeing loans made to Fairborn Property Company, Inc., (a wholly-owned subsidiary of Dearborn Gear & Tool Co., Inc.) by Bank of the Commonwealth and for making payment on said guarantees to said bank in 1974, was the protection of his employment as president of Dearborn Gear & Tool Co., Inc.

II. The Right of Subrogation by Plaintiff, EDWARD T. ARCY, SR., against Dearborn Gear & Tool Company, Inc., created by Plaintiff's payment on a guarantee of a Dearborn Gear & Tool Co., Inc. debt to Bank of the Commonwealth was totally worthless in 1974, the year of payment, because said action against Dearborn lacked both Liquidating and Potential Value.

The questions presented for the consideration of the Court by the Defendant are as follows:

1. Whether plaintiffs sustained a bad debt in the year 1974; and

2. Whether the bad debt, if any, sustained by plaintiffs was a business bad debt.

The Answering Trial Brief of the Defendant relates the following:

The parties have agreed to submit this case to the court on a stipulated record consisting of the transcripts of the depositions of Della E. Arcy, Edward Thomas Arcy, Jr., Donald Graham, and Richard J. Osborn, as well as certain documents as to which there is no dispute as to authenticity.[1] During the final pretrial conference, it was further agreed that plaintiffs would file an opening brief, to be followed within 30 days by an answering brief of the United States. If necessary, plaintiffs may serve a reply brief, to

which the United States may respond by a brief in rejoinder.

The United States respectfully submits this answering trial brief. This brief will establish that plaintiffs have not met their burden in establishing that they sustained a bad debt loss in the year 1974, and that the United States is entitled to a judgment dismissing the complaint with prejudice. Alternatively this brief will show that if the bad debt loss was sustained, it must be characterized as a non-business bad debt.[2]

### The Nature of this Action

Edward T. Arcy and his wife, Della E. Arcy, filed this action on January 15, 1981, for the refund of $137,822.32, in personal income taxes, plus interest, allegedly overpaid by them during their taxable years 1971 through 1975. In their complaint, plaintiffs claimed that they sustained a business bad debt loss during the year 1974, creating a net operating loss in that year, which loss, when carried back to 1971 and then forward to 1975, entitles them to the refund sought in the complaint. Plaintiffs further allege that the prerequisites for jurisdiction of the suit—that is the timely filing of claims for refund, and disallowance of such claims by the United States—have been satisfied.

In its answer, the United States denied (a) that plaintiffs sustained a bad debt loss in 1974 and (b) that plaintiffs were entitled to the refund sought in their complaint.

Plaintiff Edward T. Arcy died on July 29, 1981. On October 15, 1982, this Court ordered that Della E. Arcy, the personal representative under the will of Edward T. Arcy, be substituted as a party for the decedent.

[1] The parties have not waived objections to questions posed in the depositions, except as to form, or to the admissibility of the documents marked as trial exhibits, as in cases where the documents contain hearsay or self-serving statements.

[2] In the event the Court determines that the plaintiffs sustained a non-business bad debt loss in 1974, plaintiffs will not be entitled to the amount of the refund demanded in the complaint. The parties have agreed in such an event that the United States will compute the amount of the refund to which plaintiffs will be entitled, subject to plaintiffs' right to submit to the court their own computation if they do not agree with the one prepared by the United States.

The proposed findings of fact submitted by the Defendant are adopted by the Court and are as follows:

1. Edward T. Arcy ("Arcy") was born on April 7, 1912. After completing high school, he attended Cass Technical School and Henry Ford Trade School. Deposition of Della E. Arcy ("D. Arcy dep.") at 12. Arcy died on July 29, 1981. Plaintiff's answer to interrogatory number 10.

2. For approximately 42 years prior to his death, Edward T. Arcy resided with his wife, Della E. Arcy ("Mrs. Arcy"), at 24406 Fairmont, Dearborn, Michigan. D. Arcy dep. at 5. The Arcys had two sons, Edward T. Arcy, Jr. and Robert Arcy, and three daughters, Betty (now Betty Roussey), Carol (now Carol Kronk), and Janice D. Arcy. D. Arcy dep. at 13.

3. On January 1, 1939, Arcy and two other partners formed the Dearborn Gear and Tool Company ("Dearborn"). Exhibit 4 at 6. On March 18, 1948, after acquiring the interests of his partners, Arcy incorporated Dearborn. Id. at 7.

4. Arcy was the sole shareholder in Dearborn until 1959 or 1960, when he transferred a small percentage of Dearborn stock to members of his family. Another transfer of stock occurred in 1972. Id. at 7. During the period January 1, 1969 until December 31, 1974, the stock ownership in Dearborn was as follows:

CLASS "A" STOCK

| Owner | Period | | | |
|---|---|---|---|---|
| | 1/1/69–7/31/72 | | 7/31/72–12/31/74 | |
| | Shares Owned | Percentage | Shares Owned | Percentage |
| Edward T. Arcy | 6346 | 84.61% | 8170 | 54.47% |
| Della E. Arcy | 1154 | 15.38% | 2408 | 16.05% |
| Robert Arcy | | | 885 | 5.90% |
| Janice Arcy | | | 885 | 5.90% |
| Edward T. Arcy, Jr. | | | 884 | 5.89% |
| Carol Kronk | | | 884 | 5.89% |
| | 7500 | | 14116 | |

CLASS "B" STOCK

| | 1/1/69–12/31/69 | | 1/1/70–12/31/70 | | 1/1/71–12/31/74 | |
|---|---|---|---|---|---|---|
| Edward T. Arcy | 18447 | 61.49% | 18447 | 61.49% | 18447 | 61.49% |
| Della E. Arcy | 1761 | 5.87% | 1761 | 5.87% | 1761 | 5.87% |
| Edward T. Arcy Foundation | 8942 | 29.51% | 9146 | 30.49% | 9207 | 30.69% |
| Mobile Parts | 150 | .50% | 18 | .06% | 18 | .06% |
| Fairlane Properties | 64 | .21% | 64 | .21% | 64 | .21% |
| Manufacturers Equipment | 636 | 2.12% | 564 | 1.88% | 503 | 1.60% |
| | 30,000 | | 30,000 | | 30,000 | |

PREFERRED STOCK

1/1/69–12/31/74

| | | |
|---|---|---|
| Alpha Trust | 15,886 | 42.31% |
| Gamma Trust | 15,886 | 42.31% |
| Beta Trust | 2,884 | 7.68% |
| Delta Trust | 2,884 | 7.68% |

Exhibit 2. During the years in question, Mobile Parts Corp., Fairlane Properties, Inc. and Manufacturers Equipment Rental, Inc. were corporations owned by Arcy, and subsequently acquired by Dearborn. The Alpha, Beta, Gamma, and Delta Trusts were short term trusts for the benefit of Arcy's children. Deposition of Donald Graham ("Graham dep.") at 3–5, 32–33; deposition of Richard J. Osborn ("Osborn dep.") at 31–32.

5. Arcy was president and treasurer of Dearborn from its inception as a corporation until the date of his death. From 1965 until the date of her husband's death, Mrs. Arcy was vice-president and secretary of the corporation. Exhibits 3–4.

6. Since 1965, and until the date of Arcy's death, Arcy and Mrs. Arcy were directors of Dearborn with various of their children and, at various times, Richard J. Osborn, Arcy's accountant, and John J. Fish, a business associate of Mr. Arcy. Exhibit 3.

7. Arcy, by virtue of his stock ownership in Dearborn and his influence among the family, had complete control over Dearborn. In the words of Richard J. Osborn, a member of the board of directors and Mr. Arcy's accountant, Arcy was "chief executive, chief operating officer, chief anything you can think of." Arcy "reported only to God." Osborn dep. at 5–6. There was never an occasion where the board of directors issued a resolution over Arcy's objection. Deposition of Edward Thomas Arcy, Jr. ("E. Arcy dep.") at 16. Arcy did not keep the members of the board of

directors advised on Dearborn's financial condition. *E.g., id.*

8. Dearborn, which remains in business today, was during the period in question and is today a manufacturer of gears, primarily used in the automotive industry. D. Arcy dep. at 8; Graham dep. at 4.

9. In addition to Dearborn, Arcy operated other corporations which related to Dearborn's business. Fairlane Properties, Inc. owns the realty used by Dearborn. Manufacturers Equipment Rental, Inc. leases machinery and automobiles to Dearborn. Automotive Packaging, Inc. sells gears and parts manufactured by Dearborn to Ford Motor Company, while Mobile Parts Corporation sells gears and parts manufactured by Dearborn to companies other than Ford. Graham dep. at 3–4. Fairlane, Manufacturers, Automotive Packaging and Mobile Parts became subsidiaries of Dearborn on July 31, 1972. Graham dep. at 32–33.

10. In 1965, Arcy and two other gentlemen, Robert S. Gay and Frank C. Padzieski, established Fairborn Properties, Inc. ("Fairborn"). Fairborn's sole business was to acquire real estate and construct a shopping center called the Village Plaza. Graham dep. at 27–28; D. Arcy dep. at 35. Construction on the shopping center began in 1966 or 1967. Osborn dep. at 7. Prior to his involvement with Fairborn, Arcy had no experience in real estate. D. Arcy at 35.

11. Fairborn required extensive initial financing to engage in the construction of Village Plaza. On February 23, 1967, Fairborn received from the Bank of the Commonwealth ("the Bank") $5,750,000.00 to meet its expenses and to refinance prior loans. This loan was guaranteed by Arcy, Padzieski, Gay and their wives. Exhibit 5.

12. Due to construction delays and shortfalls in rental income, Fairborn encountered a large and unanticipated negative cash flow that required additional financing. Osborn dep. at 21–23. In May or June of 1968, Arcy acquired sole ownership of Fairborn. A few days later, Arcy sold his interest in Fairborn to Dearborn. Osborn dep. at 16. As a result of Dearborn's acquisition of Fairborn, Dearborn's gross sales of $1,708,498.53 and net income of $206,966.54 was sheltered by Fairborn's losses. Exhibits 26, 43; Osborn dep. at 34. While Dearborn, for its taxable year ending October 31, 1967 paid $62,443.94 in corporate income tax on gross receipts of $1,663,715.28, after the acquisition of Fairborn, it paid no corporate taxes from 1968 through 1977,[1] even though gross receipts for those years (with the exception of Dearborn's fiscal year ended October 31, 1970), exceeded the gross receipts in 1967. Exhibits 42–52.

13. Fairborn's thirst for cash steadily increased after mid-1968. Between May 20, 1968 and May 23, 1969, the Bank of the Commonwealth issued to Fairborn 19 additional promissory notes for over $1,000,000. Each of these notes were personally guaranteed by Mr. and Mrs. Arcy. On August 4, 1969, the Bank of Commonwealth agreed to make an additional construction loan to Fairborn in the amount of $629,077.06. Exhibits 6–8.

14. On August 4, 1969, Dearborn's financial backing of Fairborn's venture began when it co-signed a promissory note for $1,750,000 from the Bank of the Commonwealth. Exhibit 9. The purpose of the note was to provide additional construction financing to Fairborn. Exhibit 8. Dearborn became a co-obligor on the note because the Bank would not continue lending money to Fairborn without Dearborn's financial backing. The Bank felt that Fairborn was not adequately capitalized. Graham dep. at 32. This note was personally guaranteed by Mr. and Mrs. Arcy, up to $1,450,000. Exhibits 11–12. Providing further collateral for the loan, Dearborn and Fairborn executed a financing agreement with the Bank, Exhibit 10, and Arcy, as settlor of the Alpha and Beta Trusts (referred to above at paragraph 4), also as-

---

**1.** During discovery in this case, the United States did not request Dearborn's income tax returns for the years since 1977.

signed his reversionary interest in the trusts. In addition, Mobile Parts Corp., Manufacturers Equipment Rental, Inc., Fairlane Properties, Inc., and Automotive Packaging Corp. guaranteed Fairborn and Dearborn's indebtedness to the Bank and granted security interests to the Bank in their personal property. Exhibit 14. None of the funds borrowed from the Bank were intended to be used for meeting the operating expenses of Dearborn, which has never had to rely on outside borrowings for working capital. The funds that were borrowed from the Bank were used exclusively for completing construction of the Village Plaza. Osborn dep. at 18.

15. Arcy's dominant motive in guaranteeing the notes to Fairborn and Dearborn was to provide funds for the Fairborn Village Plaza Shopping Center. Osborn dep. at 18. As of October 31, 1969, Dearborn had total assets of $3,710,202.99, and a net worth of $1,507,053.51. In that year, its net income was $508,051.14 on gross sales of $1,992,615.31. Exhibit 27.

16. There is no evidence that Dearborn's board of directors discussed the loans by the Bank to Dearborn and Fairborn. The decision to cause Dearborn to be obligated on the Bank's financing of Village Plaza was made by Arcy alone. D. Arcy dep. at 49.

17. By October 26, 1973, Fairborn and Dearborn were in default of their obligations to the Bank. As part of a settlement agreement (Exhibit 14) with the Bank, the Arcys, individually and as trustees of the Alpha, Beta, Gamma and Delta trusts, consented to the sale of 41,995 shares of stock in Dearborn Bank and Trust Company at a public auction, to be applied to the outstanding loans to Fairborn and Dearborn. Exhibit 13. On June 6, 1974, 33,563 shares of stock were sold, resulting in the $552,- 834.50 loss claimed by plaintiffs. Stipulation No. 3. As of October 31, 1973, Dearborn's total stockholders' equity amounted to $2,875,245.36. Exhibit 30. In 1974, the total stockholders' equity decreased to $2,005,370.42. Exhibit 31.

18. Arcy's dominant motive for using personal assets to reduce the Bank loans, rather than requiring Dearborn and Fairborn, the primary obligors on the loans, to pay the Bank, was to protect his substantial investment in Dearborn. Although Arcy owned a number of companies, he was proudest of Dearborn. Every Christmas he regularly repeated to his family that "Dearborn is gold ... Dearborn is our gold mine." The files of each of the corporations Arcy owned were color-coded. Dearborn's files were always gold colored. All of the Arcys' children worked for Dearborn. Arcy frequently told members of his family that he wanted the business to continue after his death, and that it be kept in the family to be passed on to his grandchildren. E. Arcy dep. at 6–18.

19. On August 16, 1976, Dearborn and its subsidiaries, including Fairborn, entered into an amended loan settlement agreement in which: (1) the Bank received $174,- 600.48, (2) certain of the debt remaining was forgiven by the bank; (3) the indebtedness of the Arcys and their corporation was increased by approximately $300,000 as a result of a civil judgment against Fairborn, and (4) the remaining debt was consolidated into a note in the amount of $1,781,- 278.66. Exhibit 15.

20. Between October 31, 1979 and October 31, 1980, the indebtedness of Dearborn and its subsidiaries to the Bank was reduced from $931,886.05 to $109,409.36. Of this amount, approximately $360,000 represented payments to the Bank, and $462,000 was the result of forgiveness by the Bank. Graham dep. at 25; Exhibit 33. Between October 31, 1980 and July 31, 1981, Dearborn made nine payments to the Bank totalling $126,806.67. Dearborn's indebtedness to the Bank has been extinguished. Exhibit 40; Graham dep. at 25.

21. Whatever financial difficulties Dearborn has encountered are largely attributable to Fairborn's failing Village Plaza project. Arcy had no doubt that Dearborn would continue in business successfully. Osborn dep. at 31. Dearborn had no sizeable debts in 1974 other than those to the

Bank, and has successfully reduced its present debt to the Internal Revenue Service (see Stipulation Nos. 6 and 7), which has permitted Dearborn to pay its debt over a period of years. During 1974, Dearborn was not being pressed by its other creditors. Graham dep. at 36–38. Dearborn has not found it necessary to borrow money to continue in operations since 1974. D. Arcy dep. at 43.

22. At present, Dearborn employs fifty to sixty employees. Graham dep. at 4. No receiver has been appointed for Dearborn, it has never been declared a bankrupt, and there is no litigation against it now. Graham dep. at 7–8, 39. Dearborn presently has no creditors that are threatening litigation to collect debts due to them. *Id.* at 24.

23. As secretary, treasurer and general manager of Dearborn and its subsidiaries, Don Graham is presently responsible for managing the company on a day-to-day basis. Graham now occupies the office that belonged to Edward T. Arcy before he died. Graham dep. at 10. Della Arcy became president after her husband's death. She testified that her annual salary is approximately $150,000 per year. Her duties include "filing, typing, entertaining." D. Arcy dep. at 7–8. During her deposition, Mrs. Arcy stated that while Dearborn purchases steel in order to manufacture gears, she could not identify one of Dearborn's suppliers. Nor could she identify the contact person at Chrysler Corporation, one of Dearborn's major customers. *Id.* at 8–9. Mrs. Arcy does not maintain a desk at Dearborn, and does not work there on a daily basis. Graham dep. at 11.

24. Between the years 1969 and 1980, Arcy and Mrs. Arcy received the following salaries from Dearborn:

| Year | Exhibit | Salary | Estimated Salary After Taxes |
|---|---|---|---|
| 1980 | 57 | $98,700 | $47,949 |
| 1979 | 56 | 99,500 | 73,640 |
| 1978 | 55 | 90,450 | 61,298 |
| 1977 | 54 | 120,325 | 98,666 |
| 1976 | 53 | 45,525 | 45,525 |
| 1975 | 22 | 96,262 | 62,109 |
| 1974 | 21 | 82,900 | 57,616 |
| 1973 | 20 | 83,039 | $64,555 |
| 1972 | 19 | 64,681 | 46,894 |
| 1971 | 18 | 69,100 | 54,735 |
| 1970 | 17 | 78,100 | 48,182 |
| 1969 | 16 | 95,600 | 67,875 |

These salaries and the salaries of all of Dearborn's employees were set by Arcy. D. Arcy dep. at 44.

25. Since 1974, the Arcy family has continued to receive generous fringe benefits from Dearborn. Thus, Mr. Arcy had use of a 45-foot cruiser owned by Dearborn, which he used approximately four times a week. D. Arcy dep. at 17–19. Dearborn also provided Mr. Arcy and his family with membership at the Dearborn Country Club and the Grosse Pointe Country Club. *Id.* at 20–22. Dearborn also paid for membership at the Detroit Athletic Club and the Recess Club in the Fisher Building. *Id.* Lunches and dinners at these clubs were also paid for by Dearborn. *Id.* at 24. In addition, Mr. Arcy used American Express, Bank Americard and Northwestern National credit cards issued in the name of the corporation. Bills for these cards were paid by Dearborn. Dearborn provided Mr. and Mrs. Arcy with Blue Cross and Blue Shield coverage. *Id.* It furnished Arcy with a Lincoln Versailles or a comparable model automobile every other year. Both of his sons also had use of company cars. Graham dep. at 14; E. Arcy dep. at 13–14. Mr. and Mrs. Arcy participated in corporate sponsored pension and profit sharing plans. The pension plan lump-sum distributions to Mr. Arcy totalled nearly $400,000, while Mrs. Arcy received somewhat less than $100,000. Mr. Arcy's distribution from the profit sharing trust in 1979 exceeded $150,-000; Mrs. Arcy's distribution was about $25,000. Graham dep. at 11–14. Mr. Arcy was aware of the probable amount of these payments prior to 1969. *Id.* at 12.

26. According to its financial statements, Dearborn and its subsidiaries since 1968 have had net income as follows:

| Fiscal Year Ending | Exhibit | Net Income or (Loss) |
|---|---|---|
| October 31, 1968 | 26 | $206,966.54 |
| October 31, 1969 | 27 | 508,051.14 |
| October 31, 1970 | 28 | 120,788.10 |
| October 31, 1971 | 29 | 250,140.00 |
| October 31, 1972 | 34 | 25,313.00 |
| October 31, 1973 | 30 | 119,643.59 |

| Fiscal Year Ending | Exhibit | Net Income or (Loss) |
|---|---|---|
| October 31, 1974 | 31 | $225,707.47 |
| October 31, 1975 | 32 | (26,816.80) |
| October 31, 1976 | 35 | 105,267.86 |
| October 31, 1977 | 36 | 102,880.08 |
| October 31, 1978 | 37 | 146,045.19 |
| October 31, 1979 | 39 | 598,472.07 |
| October 31, 1980 | 33 | 103,061.21 |

Dearborn's financial statements still reflect a loan payable from it to Edward T. Arcy as a result of the sale of stock referred to in paragraph 17.

■ The Dominant Motive for the guarantees was not to protect Mr. Arcy's employment with Dearborn but instead the guarantees were made to insure continued financing for the Village Plaza Shopping Center being developed by Fairborn. A guarantor's loss on payment under this guarantee which gives rise to a right of subrogation against the principal debtor is deductible, if at all, under Code Section 166. Such a loss is not deductible under any other provision of the Code.

■ Code Section 166(a)(1) requires that the debt be wholly worthless. To be sure, under Code Section 166(a)(2), a deduction may be allowed for a business bad debt which becomes partially worthless during the taxable year, but only in an amount up to the portion of the debt charged off by the taxpayer within the taxable year. Since Plaintiffs did not charge off any part of the debt here involved in 1974, this provision is not applicable. Thus, to be entitled to any deduction under Section 166 for 1974, Plaintiffs must prove that the debt, whether business or non-business, became wholly worthless within that year. *Hubble v. Commissioner*, T.C.Memo. 1981–625, 42 TCM 1537, 1543 n. 14 (1981).

Accordingly, the Plaintiffs, who claim their deductions by virtue of their payment under the guarantee of one of the bank's loans to Fairborn and Dearborn, must establish that they can meet the requirements of Code 166, particularly that the debt running from Dearborn to the Arcys by reason of the Arcys' right of subrogation became wholly worthless in 1974.

In determining whether the Plaintiffs are entitled to a bad debt loss, they must show that in 1974, the year the loss was claimed, Dearborn was unable to repay and had no potential for repaying the Arcys any portion of the monies paid by the Arcys to the bank under their guarantee. None of the factors relied upon by the Plaintiffs' opening brief established that the debt in question was worthless. Thus, Mertens, in his treatise on Federal Income Taxation, notes that:

> Worthlessness is not proved by mere failure of a debtor to pay promptly. Worthlessness is not necessarily proven because of evidence of stagnant business conditions; that the accounts are slow or overdue; that the debtor failed to make a profit during the year in question; that the debtor sustained losses in two successive years; that the debtor was in straightened financial circumstances; [or] that the cost of operations increased . . . .

5 J. Mertens, Law of Federal Income Taxation, Section 30.65 (1980).

Even proof of insolvency is not proof of worthlessness:

> Neither insolvency nor dissolution of the debtor necessarily demonstrates total worthlessness of the debt . . . . Insolvency generally means an insufficient amount of property to pay all of the debtor's debts in full, but the state of insolvency does not necessarily mean that none of the debts will be paid at all.

*Id.* at 30.57.

In this case, Dearborn continued in business after 1974, and remains in business today. Dearborn and its subsidiaries, during the fiscal year 1974 through 1980, had a total net income of $1,295,697.00. Find-

ings of Fact No. 17.2[2] In addition, Dearborn provided Mr. and Mrs. Arcy with salaries during those years in the amount of $633,662. In 1977, three years after plaintiffs contend Dearborn was unable to pay the debt to the Arcys, Mr. and Mrs. Arcy drew salaries totalling $120,325, the highest ever paid to them. Since 1974, Dearborn continued to provide the Arcys and their children with country' club memberships, credit cards, use of a yacht, automobiles, and profit sharing and pension plan benefits. At present, Mrs. Arcy earns a grossly excessive salary considering the fact that she has limited business experience and does not appear at Dearborn's offices on a regular basis. Findings of Fact Nos. 23–25. The salaries and benefits to the Arcys since 1974 only further emphasize the meritless nature of plaintiffs' claims that Dearborn's debt was worthless in 1974. *Skeldon v. Commissioner*, 18 B.T.A. 950 (1930).

Dearborn since 1969 has been and continues to be a healthy and prosperous business, earning profits consistently. Dearborn's debt to the Bank of the Commonwealth has been completely extinguished, and its debt to the Internal Revenue Service has been substantially reduced. During the period of November 1, 1981 to March 31, 1982, the debt was reduced by $350,212.04, and $268,955.50 in interest remains unpaid, Stipulation No. 7, and there is no reason to doubt that it may continue its business for many years in the future.

Here, the plaintiffs have not shown that they will be unable to subject even a portion of the net income earned by Dearborn to secure a gradual decrease in the debt and perhaps its eventual payment.

2. At page 17 of their brief, plaintiffs contend that Dearborn sustained losses from 1968 through 1974, the year the alleged bad debt was sustained. These figures, which appear on Dearborn's federal 'income tax returns, are actually paper losses, reflecting the net operating loss deductions attributable to Fairborn's Village Plaza project. Osborne dep. at 34. In fact, Dearborn's own financial statements show net income as follows:

*Id.* at 583. Plaintiffs' failure to show that Dearborn, a closely-held corporation, will be unable to make even some payments toward the debt, establishes that they have not met the burden of showing that the debt is worthless.

The Arcys were not the only parties who guaranteed the loan from the Bank of the Commonwealth to Dearborn and Fairborn; guarantees of that loan were also executed by Mobile Parts Corp., Fairlane Properties, Inc., Manufacturers Equipment Rental, Inc., and Automotive Packaging Corp. Findings of Fact No. 14.

In light of the foregoing, the Court determines that the Arcys did not sustain a wholly worthless bad debt in 1974, and accordingly, the plaintiffs complaint is dismissed with prejudice.

I already indicated the Court has adopted the Defendant's findings of fact. Inasmuch as there was no trial testimony, and parties agreed to submit this case to the Court on a stipulated record of the transcripts of the depositions of Della Arcy, Edward Arcy, Donald Graham, and Richard Osborn, as well as certain documents to which there is no dispute as to authenticity, the Court felt free to adopt the Defendant's position in this matter.

*O'Leary, et al v. Liggett Drug Co.*, 150 F.2d 656–667, is authority for this action.

The fact that proposed findings of fact, prepared and submitted by the successful attorneys, have been adopted by the trial court does not detract from their legal force or effect. When adopted, such findings become the findings of the court, and are entitled to the same respect as if the judge, himself, had draft-

| Fiscal Year Ending | Exhibit | Net Income or (Loss) |
|---|---|---|
| October 31, 1968 | 26 | $206,966.54 |
| October 31, 1969 | 27 | 508,051.14 |
| October 31, 1970 | 28 | 120,788.10 |
| October 31, 1971 | 29 | 250,140.00 |
| October 31, 1982 | 34 | 25,313.00 |
| October 31, 1973 | 30 | 119,643.59 |
| October 31, 1974 | 31 | 73,603.83 |

Plaintiffs' figures contrasted with the figures above illustrate that Fairborn became a subsidiary of Dearborn simply to shield Dearborn's

ed them. *Simons v. Davidson Brick Co.*, 9 Cir., 106 F.2d 518–521.

An order in accordance with this opinion may be presented.

income from federal corporate income taxation.

See Finding of Fact No. 12.